STATE of Wisconsin, Plaintiff-Respondent,

v.

Alan A. RANDALL, Defendant-Appellant.

Supreme Court

*No. 93–0219–CR. Oral argument November 10, 1994.—Decided May 10, 1995.*

(Also reported in 532 N.W.2d 94.)

For the defendant-appellant there were briefs by *James A. Walrath* and *Legal Aid Society of Milwaukee, Inc.,* Milwaukee and oral argument by *James A. Walrath.*

For the plaintiff-respondent the cause was argued by *Sally L. Wellman,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

Amicus curiae brief was filed by *Karen Kotecki* and *Kotecki & Radtke, S.C.,* Milwaukee for the American Civil Liberties Union of Wisconsin Foundation and Wisconsin Coalition for Advocacy.

HEFFERNAN, CHIEF JUSTICE. This case is before the court on acceptance of certification by the court of appeals, pursuant to sec. (Rule) 809.61, Stats. The defendant, Alan A. Randall (Randall), appeals from a January 15, 1993, order of the circuit court for Waukesha County, Joseph E. Wimmer, Circuit Judge, denying his motions challenging the constitutionality of sec. 971.17(2), Stats., (1987–88).[1] The state did not oppose the certification.

The single question certified by the court of appeals is:

(1) Does the Wisconsin statutory scheme, which allows the state to confine an insanity acquittee[2] who is no longer mentally ill, solely on the grounds that the individual is a danger to himself, herself or others, violate the Due Process Clause of the United States Constitution.

We hold that it is not a denial of due process for an insanity acquittee who has committed a criminal act to be confined in a state mental health facility for so long

---

[1] The parties agree that for the purposes of this review, Wisconsin Revised statutes, 1987–88 apply to the instant case.

[2] We use the terms "insanity acquittee" and "acquittee" interchangeably throughout this opinion to refer to an individual who has been tried and convicted of a criminal offense and subsequently excused from responsibility for the criminal act as a result of having successfully proved to a jury or by stipulation with the state, that he or she suffered from a mental disease or defect at the time of the offense.

as he or she is considered dangerous, provided that the commitment does not exceed the maximum term of imprisonment which could have been imposed for the offense charged. We think the fact that an insanity acquittee has already been shown beyond a reasonable doubt to have committed at least one dangerous act justifies the disposition set forth by the legislature in sec. 971.17(2), Stats. Furthermore, we believe that our decision here is not inconsistent with the recent United States Supreme Court decision, *Foucha v. Louisiana,* 112 S.Ct. 1780 (1992). As we explain in detail below, we read *Foucha* to permit the continued confinement of dangerous but sane acquittees in a mental health facility, so long as they are treated in a manner consistent with the purposes of their commitment, *e.g.,* there must be a medical justification to continue holding a sane but dangerous insanity acquittee in a mental health facility.

We recognize that the state of Wisconsin has a legitimate and compelling interest in protecting the community from those individuals who are a continuing threat to society and to themselves. It is apparent from the statutory scheme, that the legislature has determined that the inference of dangerousness drawn from a verdict of not guilty by reason of insanity continues, even after a clinical finding of sanity. *See Foucha v. Louisiana,* 112 S.Ct. 1780 (1992).

The inference of continuing dangerousness provides the basis for the acquittee's initial commitment to a mental health facility following the insanity acquittal. Under Wisconsin's statutory scheme, the acquittee, once committed, is subject to treatment programs specifically designed to treat both mental and behavioral disorders. Treatment designed to reduce those behavioral disorders which render the individual dangerous

807

may continue even after clinical signs of mental illness are no longer apparent. Such treatment is necessary to realize the ultimate goal of safely returning the acquittee into the community. Because this state's mental health facilities provide such comprehensive treatment we cannot conclude that it is punitive to continue an acquittee's confinement based on dangerousness alone. Rather, we conclude that there is a reasonable relationship between the commitment and the purposes for which the individual is committed and, therefore, that insanity acquittees are treated in a manner consistent with the purposes of their commitment. We therefore affirm the decision of the circuit court and remand the cause for further hearing in accordance with this decision.

Furthermore, unlike the Louisiana statutory scheme held unconstitutional in *Foucha, supra,* we find that the Wisconsin scheme provides sufficient procedural safeguards to insure an acquittee's right to due process. Under the Louisiana statutory scheme, an insanity acquittee could be held in a mental institution for an indefinite and unlimited duration until the acquittee could prove, by a preponderance of the evidence, that he or she was no longer dangerous.[3] Under the Wisconsin procedure, the state, rather than the acquittee, bears the burden to prove by clear and convincing evidence that the commitment should continue because the individual is presently a danger to himself, herself or others. Moreover, commitment is not imposed for an indefinite period of time. Section 971.17(4), Stats., (1987–88) provides that the commitment may not exceed the maximum term of imprisonment which could have been imposed for the

---

[3] LA. CODE CRIM. PROC. ANN. arts. 558.1 & 654–657 (West 1993).

offenses charged.[4] Once the maximum period of the sentence which could have been imposed has elapsed, the court must order the discharge of the insanity acquittee subject to the state's right to commence civil commitment proceedings under ch. 51. *Id.*

The facts and procedural history of this case are not in dispute. Defendant, Alan A. Randall, was charged in 1976 with three counts of first-degree murder, seven counts of burglary, and two counts of operating a motor vehicle without the owner's consent. Several of these charges arose out of an incident in which Randall shot and killed two police officers and used their squad car to commit a burglary.

Initially, Randall entered a plea of not guilty and not guilty by reason of insanity to all twelve counts. Later, by stipulation and agreement of counsel, Randall withdrew his plea of not guilty by reason of insanity to four counts of burglary.

As a result of joining a plea of not guilty with a plea of not guilty by reason of insanity to eight counts, Randall was subject to sec. 971.165, Stats., (1987–88) which provides that the trial is a bifurcated proceeding. In the first phase the guilt or innocence of the defendant is determined. The burden of proof at this phase is on the state to prove all the elements of the offense charged, beyond a reasonable doubt. If a guilty verdict is returned, the issue at the second phase of the trial is whether the defendant may be relieved of responsibility for the criminal act because he or she suffered from a mental disease or defect at the time of the offense. The standard for finding mental disease or defect as set forth in sec. 971.15(1), Stats., provides:

---

[4] The statute as presently revised, limits the acquittee's confinement to two-thirds of the maximum sentence which could have been imposed. Section 971.17(1), Stats., (1991–92).

> A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacked substantial capacity either to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law.

Section 971.15(3) provides that "[m]ental disease or defect excluding responsibility is an affirmative defense which the defendant must establish to a reasonable certainty by the greater weight of the credible evidence." According to sec. 971.165(2), if the plea of not guilty by reason of mental disease or defect is tried to a jury, the verdict is not valid unless at least five sixths of the jurors agree.

At the first phase of the trial, the jury found Randall guilty of two counts of first degree murder, four counts of burglary and one count of operating a motor vehicle without the owner's consent. The jury found Randall not guilty of one count of first degree murder, two counts of burglary and one count of operating a motor vehicle without the owner's consent.[5]

---

[5] The trial court record of the guilt phase of Randall's original trial and the insanity proceedings following the guilt phase have been lost. The state has asserted, and Randall has not challenged the assertion, that he was convicted, in phase one, by a twelve person jury. The state has also asserted, and Randall has not challenged, that the second phase of the trial was obviated because the state stipulated to Randall's plea of not guilty by reasons of mental disease or defect. This is confirmed in a letter dated June 1, 1988, from the original trial Judge, William G. Callow, to James Bolek, ACSW, Winnebago Mental Health Institute. The letter is appended as an exhibit to Judge Wimmer's Decision and Order dated January 15, 1993. The letter provides in relevant part:

> At the conclusion of the trial, upon stipulation on the record concerning his mental disease, counsel for the state acceded to the

In lieu of the second phase of the trial, the state entered into a stipulation on the record whereby it agreed that Randall was not guilty by reason of mental disease or defect of two counts of first-degree murder, one count of burglary and one count of operating a motor vehicle without consent. As a result of the stipulation Randall was committed to Central State Hospital on four charges, pursuant to sec. 971.17(1), Stats., (1987–88), which provides: "When a defendant is found not guilty by reason of mental disease or defect, the court shall order him to be committed to the department to be placed in an appropriate institution for custody, care and treatment until discharged as provided in this section."

As to the remaining four counts of burglary for which Randall was found guilty, he was sentenced on one count to a term of one thousand days in the Waukesha County Jail which had been satisfied by his incarceration from January 1975 to December 1977. On the remaining three counts, he was sentenced to three concurrent terms of ten years in the state prison, which sentences were stayed with the provision that the defendant be placed on probation for three, concurrent ten year terms. The probation was stayed until the

---

defense's contention that Mr. Randall was suffering from a mental illness diagnosed as paranoid schizophrenia.

. . .

By virtue of the above-mentioned stipulation, the second portion of the trial was avoided, and Alan Randall escaped the burden of proving mental illness. Because the state accepted this stipulation, Randall escaped the possibility of being committed to the state prison for two life terms for the two murders he committed and substantial time for his other crimes. Had he been sentenced to two consecutive life terms and other appropriate terms, he would have had to serve at least thirty-six years before he would have been eligible for parole.

defendant's release from the order committing him to Central State. Following the initial order of commitment, Randall was transferred to the Winnebago Mental Health Institute where he is presently confined.

On January 11, 1990, more than fifteen years after his conviction, Randall petitioned the circuit court, pursuant to sec. 971.17(2), Stats., (1987–88) for "Reexamination" of his present mental condition.[6] The standard for release in sec. 971.17(2) (1987–88) provides:

> [i]f the court is satisfied that the defendant may be safely discharged or released without danger to himself or herself or to others, it shall order the discharge of the defendant or order his or her release on such conditions as the court determines to be necessary. If it is not so satisfied, it shall recommit him or her to the custody of the department.

The hearing on petition for reexamination, held solely to determine Randall's present dangerousness, was heard by a six-person jury. During four days of trial, police officers testified to the offenses Randall committed in 1974 and 1975, Randall's confession was read to the jury, psychiatric and mental health experts testified to the defendant's mental condition and treatment since his commitment in 1977, and other witnesses testified to Randall's history of off-grounds privileges for the purposes of employment, attending

---

[6] Randall's petition also sought declaratory relief pursuant to sec. 806.04, Stats. That part of the petition is not relevant to this appeal.

college and pursuing recreational activities.[7] The jury

[7] Randall's history of off-grounds privileges from Winnebago are set forth in his second petition, titled "Verified Petition for Re-Examination and Release on Conditions and for Declaratory Relief,": filed June 7, 1991. The petition provides in part:

(9) In 1981, petitioner was authorized by Institute physicians, psychologists and counselors to engage in supervised off-grounds activities. Petitioner participated in supervised educational, social, and recreational activities in communities throughout northeastern Wisconsin on 39 occasions between February 17, 1981 and December, 1981. Petitioner spent more than 140 hours outside the Institute grounds during these activities.

(10) In 1982, petitioner participated in more supervised, off-grounds activities throughout northeastern Wisconsin on at least 64 different occasions for more than 250 hours.

(11) In 1983, petitioner participated in more supervised, off-grounds activities throughout Wisconsin on at least 50 different occasions for more than 590 hours.

(12) In 1984, petitioner participated in more supervised, off-grounds activities throughout Wisconsin on at least 85 different occasions for more than 424 hours.

(13) In 1985, petitioner was authorized by Institute physicians, psychologists and counselors to participate in off-grounds activities on an individual sign-in and sign-out basis. Petitioner thereafter participated in numerous educational, social, and recreational activities throughout northeastern Wisconsin on at least 150 different occasions during the year. These activities included attendance at college classes so that petitioner functioned under normal conditions outside the Institute for more than 800 hours.

(14) In 1986, petitioner continued his participation in off-grounds activities on an individual sign-in and sign-out basis. Petitioner participated in numerous activities throughout Wisconsin on at least 200 different occasions. These activities included attendance at college courses and steady employment at a local business, so that petitioner functioned under normal conditions outside the Institute for over 1,300 hours.

Randall's unescorted off-grounds activities continued through the fall of 1989 when Winnebago's policy permitting this privilege ended.

returned a unanimous verdict on May 25, 1990, finding Randall "should be recommitted to the custody of the Department of an appropriate Institution." Randall was returned to Winnebago.

On June 7, 1991, Randall filed a second petition, this time for "Re-examination and Release on Conditions." Unlike the first petition, the second did not request a jury trial. For reasons unrelated to this appeal, no immediate action was taken on Randall's second petition. The case was ultimately re-assigned to the Circuit Court of Waukesha County, Circuit Judge Joseph E. Wimmer.[8]

On January 10, 1992, relying on the 1991 reports of court-appointed psychiatrists indicating that he was not mentally ill,[9] Randall filed a motion seeking

[8] The case was initially assigned to Waukesha County, Circuit Judge Roger P. Murphy. In prehearing proceedings, Judge Murphy directed the parties to summarize the testimony and evidence likely to be presented at the second hearing. Those summaries indicated that there would be little new evidence presented. In view of this, and because Randall had requested a trial to the court, Judge Murphy thought it would be difficult for him to make a finding contrary to the jury's verdict and therefore, he signed an Order of Disqualification, September 6, 1991.

On September 19, 1991, Chief Judge Mark S. Gempeler advised Judge Murphy that his disqualification was insufficient. Randall sought appellate review of the Chief Judge's nonfinal order. Ultimately, the issue of disqualification was mooted when Judge Murphy rotated out of Branch I and his caseload was reassigned to Judge Wimmer. This case is presently in Branch I before Judge Wimmer.

[9] In the instant case, the state does not concede that Randall is no longer mentally ill and Judge Wimmer concluded in the his Decision, dated January 15, 1993, that there had been no evidence presented to the court or to a jury since 1977 that Randall is no longer mentally ill. Nonetheless, the testimony of

814

release based on *Jones v. United States,* 463 U.S. 354 (1983). *Jones* had upheld a District of Columbia statute requiring both mental illness and dangerousness to coexist for the continued commitment of an insanity acquittee. On January 22, 1992, Judge Wimmer entered an order requiring the court-appointed psychiatrists to re-examine Randall and file updated reports by June 1, 1992; the court scheduled a hearing on Randall's motion for June 5, 1992 and the trial for June 22, 1992.

On May 18, 1992, the United States Supreme Court decided *Foucha v. Louisiana, supra.* On June 1, 1992, Randall filed a "Motion for Discharge and Supplemental Relief" on the grounds that *Foucha* supported his immediate release. The parties submitted briefs to the circuit court on the issue of whether Wisconsin's statutory scheme for re-commitment was constitutional following *Foucha.* On January 15, 1993, the circuit court denied Randall's Motion to Dismiss, dated January 7, 1992, and his motion for Discharge and Supplemental Relief, dated May 29, 1992. The decision was based on the following findings: (1) At no time since 1977, had either a jury or the court found that Alan Randall no longer suffered from mental disease or illness; (2) the Louisiana statute at issue in *Foucha* is distinguishable from the procedure used in Wisconsin under sec. 971.17(2), Stats., (1987–88); (3) sec. 971.17(2), Stats., (1987–88), does not violate either the Due Process or Equal Protection Clauses of the Fourteenth Amendment to the United States Constitu-

court-appointed psychiatrists reread to the jury during closing argument at Randall's first release hearing indicates those physicians found no evidence of present mental illness. *See Partial Transcript, Trial on Petition for Re-examination,* May 22 through May 25, 1990, 156–59.

tion; and (4) the American Law Institute's position on dangerousness. The ALI concluded:

> that, [i]t seemed preferable . . . to make dangerousness the criterion for continued custody, rather than to provide that the committed person may be discharged or released when restored to sanity as defined by the mental hygiene laws. Although his mental disease may have greatly improved, an (insanity acquittee) may still be dangerous because of factors in his personality and background other than mental disease. Also, such a standard provides a means for the control of the occasional defendant who may be quite dangerous but who successfully feigned mental disease to gain an acquittal.[10]

*See* Decision, Circuit Court Judge, Joseph E. Wimmer, January 15, 1993. Randall appealed the circuit court decision and the court of appeals certified the question to this court.

The question before the court is not the legitimacy of Randall's initial commitment, but rather whether his continued commitment to Winnebego Mental Health Institute may be based on dangerousness alone. Randall argues that in light of *Foucha,* the state cannot continue to confine a sane but dangerous insanity acquittee in a mental institution for two reasons: first, because "[a]ny reexamination procedure involving an NGI acquittee *must* involve a dual finding as to the acquittee's present mental condition *and* dangerousness." *See Appellant's Brief* at 21; and, second, because the nature of the confinement must be reasonably related to its purposes, a sane but dangerous acquittee cannot be held in a mental facility absent a medical

---

[10] *Model Penal Code,* sec. 4.08, Comment 3, 259–260 (1985).

justification, which necessarily disappears when the acquittee recovers from mental illness.

The state argues that its right to continue the commitment of insanity acquittees who are sane but dangerous is based on the state's authority to incapacitate those who have been adjudged guilty of criminal conduct, beyond a reasonable doubt. The state points out that incapacitative confinement, based on dangerousness, comports with the view, recognized by the Supreme Court and this court, "that insanity acquittees constitute a special class that should be treated differently from other candidates for commitment." *Jones,* 463 U.S. at 370; *State v. Gebarski,* 90 Wis. 2d 754, 771–72, 280 N.W.2d 672 (1979). For reasons we explain below, we disagree with Randall's assertion that there is no therapeutic value to confining a sane but dangerous acquittee to one of this state's mental health facilities. And although we agree that the state may incapacitate convicted felons who have, by reason of their insanity acquittal, been excused from responsibility for their criminal conduct, continued confinement may not rest on that rationale alone. To be constitutionally permissible, the continued confinement of a sane but dangerous insanity acquittee in a mental health facility, must have some therapeutic value.

Earlier decisions of the United States Supreme Court and this court provide the background and the basis for our decision here. We turn first to the history of post-acquittal confinement in the Supreme Court of the United States.

## I. Post-Acquittal Confinement

### A. United States Supreme Court

■ The Supreme Court has held that "commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas,* 441 U.S. 418, 425 (1979). Therefore, a state must have "a constitutionally adequate purpose for the confinement." *O'Connor v. Donaldson,* 422 U.S. 563, 574 (1975). The Court has also concluded that civil and criminal committees may be treated differently because "insanity acquittees constitute a special class that should be treated differently from other candidates for commitment." *Jones v. United States,* 463 U.S. 354, 370 (1983).[11]

Perhaps the most significant difference between civil and criminal commitment is the burden of proof required to justify commitment. In civil commitment proceedings, the state is required to prove by clear and convincing evidence that a proposed committee is mentally disabled and dangerous. *Addington, supra.* This is often referred to as the *Addington* burden, named for the decision that first stated the principle.

In *Jones v. United States, supra,* the Supreme Court held that the state may commit an insanity acquittee without satisfying the *Addington* burden of proof with respect to mental illness and dangerousness. As a consequence, an insanity acquittee may be confined under a lesser burden of proof. The lesser burden allows the defendant to prove insanity by a

---

[11] The term "special class" is intended here to distinguish between those persons committed pursuant to involuntary civil commitment procedures and insanity acquittees committed pursuant to an insanity acquittal.

preponderance of the evidence. *Jones,* 463 U.S. at 368.[12]

The higher standard for civil commitment was approved in *Addington,* because of the Court's concern that "members of the public could be confined on the basis of 'some abnormal behavior which might be perceived by some as symptomatic of a mental or emotional disorder, but which is in fact within a range of conduct that is generally acceptable.' " *Jones, supra* at 367 *quoting Addington,* 441 U.S. at 427. This danger is not present in the context of an insanity acquittal, because commitment only results after the *"acquittee himself"* raises the insanity defense and proves that the criminal act was a product of his or her mental illness. *Jones, supra* at 367. In *Jones,* the Court noted "the proof that [the acquittee] committed a criminal act as a result of mental illness eliminates the risk that he is being committed for mere 'idiosyncratic behavior.' " *Jones, supra* at 367 *quoting Addington,* 441 U.S., at 427.

The Supreme Court has also concluded that an insanity acquittal is sufficiently probative of both mental illness and dangerousness to justify automatic commitment. *Jones,* 463 U.S. at 364–65. Hence, once

---

[12] The Court in *Jones* noted that although, "[a] defendant could be required to prove his insanity by a higher standard than a preponderance of the evidence. . . . [S]uch an additional requirement hardly would benefit a criminal defendant who wants to raise the insanity defense, yet imposition of a higher standard would be a likely response to a holding that an insanity acquittal could support automatic commitment only if the verdict were supported by clear and convincing evidence." *Jones,* 463 U.S. at 368 n.11.

the defendant raises the affirmative defense of insanity—whether the issue is tried or a plea accepted—the successful acquittee may be immediately committed to a mental health facility without further hearing to determine his or her present mental condition. The Court found automatic commitment justified with respect to dangerousness, because, "[t]he fact that a person has been found, beyond a reasonable doubt, to have committed a criminal act certainly indicates dangerousness." *Id.* at 364. As for mental illness, the Court held: "Nor can we say that it was unreasonable for Congress to determine that the insanity acquittal supports an inference of continuing mental illness. It comports with common sense to conclude that someone whose mental illness was sufficient to lead him to commit a criminal act is likely to remain ill and in need of treatment." *Id.* at 366.

Moreover, in *Jones* the Court held that the duration of an insanity acquittee's confinement may exceed the maximum sentence, which, but for the defendant's successful plea of insanity, could have been imposed for the underlying criminal conduct. In so holding, the Court noted that the purpose of commitment following an insanity acquittal is two-fold: to treat the individual's mental illness and to protect the individual and society from his or her potential dangerousness. *Id.* at 368. "And because it is impossible to predict how long it will take for any given individual to recover—or indeed whether he ever will recover—Congress has chosen, as it has with respect to civil commitment, to leave the length of commitment indeterminate, subject to periodic review of the patient's suitability for release." *Id.* Hence, the Court concluded that the length of an acquittee's potential maximum sentence imposes no constitutional limitation on the duration of the acquit-

tee's hospitalization because "[t]he Due Process Clause 'requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.' " *Id.*

To summarize, the Supreme Court has found the following to be constitutionally permissible: civil and criminal insanity acquittees may be treated differently with regard to the burden of proof required for the initial commitment—commitment following an insanity acquittal may be based on a preponderance of the evidence, whereas in a civil commitment the state must establish its burden of proof by clear and convincing evidence; automatic commitment following an insanity acquittal does not violate due process; the length of commitment for both civil and criminal committees may be indefinite; the term of commitment for an insanity acquittee may exceed the length of the maximum sentence the acquittee could have been subjected to had a sentence been imposed; and, following the initial commitment of an insanity acquittee, the burden of proof at a subsequent hearing for reexamination and release may be borne by the acquittee.

## B. Post Acquittal Confinement In Wisconsin

This court has considered many of the same issues. With regard to the distinction between civil and criminal committees we stated:

> [I]t does not follow that one who has been convicted, confined, and then applies for reexamination, must be judged by the same standard by which one merely civilly committed is judged under the statutes. One who has been found . . . to have perpetrated the type of criminal acts that this defendant was found by a jury to have committed and about which there is not the slightest doubt or

argument, does not stand in the same position as one who is committed as mentally ill and as a potential danger to himself or others. The dangerousness of this defendant on the day of the shooting has been amply demonstrated and the question to be decided by a jury or a court sitting without a jury on re-examination is the standard set forth by the legislature in the statutes: Is he presently a danger to himself or others.

*State v. Gebarski,* 90 Wis. 2d 754, 771–72, 280 N.W.2d 672 (1979).

In *State v. Gebarski,* decided before *Jones,* we held that under Wisconsin law, at a recommitment hearing "the state is required to prove only that the defendant is presently of danger to himself or others." *Gebarski,* 90 Wis. 2d at 757. We concluded that, "our statutes very properly set the standard of dangerousness as the criteria by which eligibility for release or further care and treatment is to be determined." *Id.* at 773. Accordingly, we found "no infringement of either due process or equal protection of the laws in the procedures set forth by 971.17(2) . . . ." *Id.*

Guided by the Supreme Court's reasoning in *Jones,* we subsequently upheld the automatic commitment provision in sec. 971.17(1), Stats. *State v. Field,* 118 Wis. 2d 269, 347 N.W.2d 365 (1984). Further, with regard to recommitment proceedings, the burden of proof at the hearing is on the state to prove dangerousness, *State v. Mahone,* 127 Wis. 2d 364, 379 N.W.2d 878 (Ct. App. 1985); and dangerousness, for recommitment, must be proven by clear and convincing evidence, *State v. Gladney,* 120 Wis. 2d 486, 355 N.W.2d 547 (Ct. App. 1984).

822

The primary authority for Wisconsin's commitment scheme is statutory. A successful insanity acquittee is committed to either Mendota or Winnebago mental health institute, pursuant to secs. 51.37(3) and 971.17(1), Stats., (1987–88), after first having been found guilty of criminal conduct, and second, after having proved that he or she suffered from a mental disease or defect at the time of the conduct thereby excusing the person from criminal responsibility. Section 971.15(1).

Thereafter, the acquittee is entitled to petition the court at regular intervals for reexamination and release. Section 971.17(2), Stats., (1987–88) provides that a person committed following acquittal of a crime by reason of insanity may be periodically examined as provided in sec. 51.20(16)(g), except that the examination shall be before the committing court. The standards for reexamination are prescribed in sec. 51.20 (16)(g), which provides, "[s]ubsections (10) to (13) shall govern the procedure to be used in the conduct of the hearing, insofar as applicable." Subsection (10) provides for a trial by jury of six people, which shall not be valid unless agreed to by at least five of the jurors. Subsection (16)(i) provides that "[s]ubsequent reexaminations may be had at any time in the discretion of the court but may be compelled after 120 days of the preceding examination . . . [and] all petitions for reexamination must be heard within 30 days of their receipt by the court." Section 51.20(13)(e) provides that "[t]he petitioner[13] has the burden of proving all required facts by clear and convincing evidence."

---

[13] "Petitioner" for the purposes of sub. (13)(e), is the state. *State v. Gladney,* 120 Wis. 2d 486, 492–93 (Ct. App. 1984).

In light of the procedures held constitutional by the Supreme Court, we conclude that Wisconsin's statutory scheme provides an insanity acquittee with more than sufficient procedural safeguards to insure his or her right to due process.

We turn now to the substantive portion of sec. 971.17(2), Stats., (1987–88), which permits the continued confinement of a sane but "dangerous" insanity acquittee.

The constitutionality of a statute is a question of law which we review de novo. *State v. Borrell,* 167 Wis. 2d 749, 762 (1992). All legislative acts are presumed constitutional, and every presumption must be indulged to sustain the law. *State ex rel. Hammermill Paper Co. v. La Plante,* 58 Wis. 2d 32, 47, 205 N.W.2d 784 (1973). "If any doubt exists it must be resolved in favor of the constitutionality of a statute." *Id.* (quoting *State ex rel. Thomson v. Giessel,* 265 Wis. 558, 564, 61 N.W.2d 903 (1953)). The burden of establishing the unconstitutionality of a statute is on the person attacking it. *State v. Unnamed Defendant,* 150 Wis. 2d 352, 365, 441 N.W.2d 696 (1989). In this case the burden is on Randall.

The assertion here, that sec. 971.17(2), Stats., (1987–88) is unconstitutional, is based on two Supreme Court decisions: *Jones v. United States,* 463 U.S. 354 (1983) and *Foucha v. Louisiana,* 112 S.Ct. 1780 (1992). We review each decision in turn.

## II. Jones & Foucha

In *Jones* the defendant, was arrested for shoplifting, a misdemeanor punishable by a maximum prison sentence of one year. Initially, Jones was found incom-

petent to stand trial and committed to a public hospital for the mentally ill. Six months later, a hospital psychologist reported to the court that Jones was competent to stand trial. Thereafter, Jones pleaded not guilty by reason of insanity; the government did not contest the plea and entered into a stipulation of facts with Jones. Subsequently, the Superior Court found Jones not guilty by reason of insanity and committed him to St. Elizabeth's pursuant to sec. 24–401(d)(1).[14]

[14] District of Columbia sec. 24–301(d)(1) provides:

> If any person tried upon an indictment or information for an offense raises the defense of insanity and is acquitted solely on the ground that he was insane at the time of its commission, he shall be committed to a hospital for the mentally ill until such time as he is eligible for release pursuant to this subsection or subsection (e) of this section.

Under this provision, automatic commitment is only permissible if the defendant raised the insanity defense.

Section 24–301(e) provides:

> Where any person has been confined in a hospital for the mentally ill pursuant to subsection (d) of this section, and the superintendent of such hospital certifies: (1) That such person has recovered his sanity; (2) that, in the opinion of the superintendent, such person will not in the reasonable future be dangerous to himself or others; and (3) in the opinion of the superintendent, the person is entitled to his unconditional release from the hospital, and such certificate is filed with the clerk of the court in which the person was tried . . . such certificate shall be sufficient to authorize the court to order the unconditional release of the person . . . but the court in its discretion may, or upon objection of the United States or the District of Columbia shall, after due notice, hold a hearing at which evidence as to the mental condition of the person so confined may be submitted . . . **The court shall weigh the evidence and, if the court finds that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or to others, the court shall order such person unconditionally released from further confinement in said hospital.** If the court does not so find, the court shall order such person returned to said hospital . . .

Under the District of Columbia's statutory scheme, Jones was entitled to a hearing within 50 days of his commitment to determine his eligibility for release. At the hearing, the acquittee has the burden to prove by a preponderance of the evidence that he or she is either no longer mentally ill or no longer dangerous.[15] Under this scheme, an insanity acquittee who proves that he or she is no longer mentally ill, must be released.[16] At the 50-day hearing, a psychologist from St. Elizabeth's testified that Jones continued to suffer from schizophrenia and that because of his illness, he continued to be a danger to himself and to others. As a result, Jones was returned to the hospital.

Although Jones appealed the decision denying his release, he did not contest the court's findings that he was mentally ill and dangerous. Nor did he argue that the standard for release, mental illness or dangerous-

---

Emphasis added.

[15] Although D.C. statute sec. 24–301(d)(2) does not specify the standard for determining release, the United States Court of Appeals for the District of Columbia Circuit in *Jones* held, under state law, that in release proceedings pursuant to sec. 24–301(e) and sec. 21–545(b), the committee must show either that he or she is no longer mentally ill or no longer dangerous. *Jones,* 463 U.S. at 357 n.3, *citing* 432 A.2d 364, 372, and n.16 (1981) (en banc).

[16] In the instant case, the state argues that the disjunctive standard for release in the District of Columbia statute—mental illness or dangerousness—applies only when the duration of the commitment exceeds the maximum sentence which could have been imposed but for the insanity acquittal. We disagree. The commitment scheme at issue in *Jones,* includes but one standard. That standard, applicable to both civil and criminal committees, requires the court to order the person released when he or she is **either** no longer mentally ill or no longer dangerous.

ness, was unconstitutional. *Id.* at 363 n.11. The Supreme Court acknowledged that it was not "asked to decide whether the District's procedures for release are constitutional."[17] *Id.*

---

[17] As this court noted in *State v. Field,* 118 Wis. 2d at 277,

The defendant [in *Jones*] argued that he was denied due process because the judgment of not guilty by reason of insanity did not constitute a finding of present mental illness and dangerousness, and because it was established only by a preponderance of the evidence . . . The defendant therefore asserted that his commitment should have been governed by the District of Columbia's civil-commitment procedures, under which an individual could be committed upon clear and convincing proof by the government that the person is mentally ill and likely to injure himself or others.

Based on Jones' argument, the Supreme Court considered three issues: (1) whether a finding of insanity at a criminal trial is sufficiently probative of mental illness and dangerousness to justify commitment to a psychiatric facility; (2) whether the indefinite commitment of an insanity acquittee based on a preponderance of the evidence is unconstitutional; and (3) whether a committed insanity acquittee is entitled to release when his confinement has exceeded his hypothetical maximum term.

With regard to the first and second issue, the Court upheld the District's statutory scheme permitting automatic commitment—when insanity is proven by a preponderance of the evidence—following an insanity acquittal. *Jones,* 463 U.S. at 367–68.

With regard to the third issue, the Court concluded that the maximum sentence which could be imposed for the criminal conduct, did not impose a constitutional limit on the duration of the acquittee's hospitalization. The Court examined the goal of commitment following an acquittal by reason of insanity and concluded that because recovery rather than retribution or deterrence provided the rationale for continued commitment, the length of the potential sentence, "chosen to reflect society's view of the proper response to commission of a particular offense," was not relevant to the goal of treatment. In light of

> It is important to note what issues are not raised in this case. Petitioner has not sought appellate review of the Superior Court's findings in 1976 and 1977 that he remained mentally ill and dangerous, and, indeed, the record does not indicate that since 1977 he ever has sought a release hearing—a hearing to which he was entitled every six months.
>
> Nor are we asked to decide whether the District's procedures for release are constitutional. As noted above, . . . the basic standard for release is the same under either civil commitment or commitment following acquittal by reason of insanity: the individual must prove that he is no longer dangerous or mentally ill . . .

*Id.* In light of this, we find it curious that at the outset of the decision in *Foucha* the Court held that the standard for continued confinement or release of an insanity acquittee, "mental illness or dangerousness," had been decided in *Jones.*

We turn now to *Foucha.*

Terry Foucha was charged with aggravated burglary and illegal discharge of a firearm. Initially he was found incompetent to stand trial and committed to a state hospital; four months later, doctors reported that Foucha was competent to stand trial. At trial, doctors testified that he was unable to distinguish right from wrong and was insane at the time of the offense. Based on this testimony, the trial court ruled that Foucha was not guilty by reason of insanity pursuant to La. Rev. Stat. Ann. § 14:14.[18]

---

this rationale, the Court concluded that recovery is the only appropriate precondition to release. *Jones,* 463 U.S. at 368–69.

[18] La.Rev.Stat.Ann. sec. 14:14 (West 1986) provides:

If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between

Once a criminal defendant is found not guilty by reason of insanity in Louisiana, that individual is committed to a psychiatric hospital and, thereafter, confinement will continue until the acquittee can prove that he or she is no longer dangerous. LA. CODE CRIM. PROC. ANN. arts. 652 & 654 (West 1993). Thereafter, release proceedings may be initiated either by the superintendent or the acquittee. LA. CODE CRIM. PROC. ANN. art. 655 (West 1993).

Four years after Foucha's initial commitment, the superintendent of the East Feliciana Forensic Facility recommended his release. According to the pretrial examination reports of court-appointed psychiatrists, there had been no evidence of mental illness since admission. The doctors recommended Foucha's conditional discharge. At the hearing for release, one of the doctors testified that, although Foucha was presently in remission from mental illness, he nonetheless suffered from an antisocial personality, a condition the doctor conceded was untreatable. *Foucha,* 112 S.Ct. at 1782.[19] Further, the doctor testified that he would not

right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility.

[19] In *Foucha,* the state argued that it had the right to continue Terry Foucha's commitment to a mental facility even though it conceded that he was no longer mentally ill and further, that he suffered only from an antisocial personality disorder which his doctors diagnosed as untreatable. *Foucha,* 112 S.Ct. at 1782.

The factual distinction between *Foucha* and the instant case is important. Unlike *Foucha,* the state has made no similar concession with respect to Randall's sanity. And this opinion expressly recognizes that the due process basis for continuing the commitment of an acquittee who is sane but dangerous, is satisfied so long as there is a *medical justification.* In so holding,

"feel comfortable in certifying that [Foucha] would not be a danger to himself or to other people." *Id.* at 1783. Accordingly, the trial court ordered Foucha returned to the mental institution.

On review to the Supreme Court, a divided court[20] concluded that Louisiana's statutory scheme violated due process and equal protection because it permits the indefinite commitment of an insanity acquittee who is no longer mentally ill to a mental hospital, and because it makes release contingent upon the acquittee's ability to prove that he or she is no longer dangerous. Writing for the Court, Justice White concluded that Louisiana's recommitment scheme failed on three grounds.[21] First,

we follow the view expressed by Justice O'Connor in her concurring opinion; a view left undisputed by the majority in that case. Justice O'Connor wrote:

> I think acquittees could not be confined as mental patients absent some medical justification for doing so; in such a case, the necessary connection between the nature and purposes of confinement would be absent., because then, there is reasonable relationship between the commitment and the purposes for which the individual is committed.

*Foucha,* 112 S.Ct. at 1789–90.

[20] We note that five justices joined in Parts I and II of the decision, which held Louisiana's statutory scheme of recommitment violated the Due Process Clause and four justices joined in Part III, which held that the statutory scheme violated Equal Protection as well.

[21] In striking down Louisiana's statutory scheme, Justice White held open the possibility that a statute carefully limited in application and narrowly focused to an important government interest—a statute with some of the virtues of the Bail Reform Act upheld in *United States v. Salerno,* 481 U.S. 739 (1987)—might justify the limited confinement of a sane but dangerous insanity acquittee. *Id.* at 1786. Louisiana's scheme failed here too, however, because the commitment was indefi-

because the state conceded that Foucha was no longer mentally ill, the basis for holding him a psychiatric facility disappeared, *Foucha,* 112 S.Ct. at 1784. The Court concluded that absent civil commitment proceedings, it was improper to keep Foucha in a mental institution against his will. *Id.* at 1785.

Second, "if Foucha can no longer be held as an insanity acquittee in a mental hospital, he is entitled to constitutionally adequate procedures to establish the grounds for his confinement." *Id.* Therefore, the Court concluded that Foucha is entitled to release unless the state commits him pursuant to a civil proceeding. *Id.*

Third, the Court observed that substantive due process bars certain arbitrary government action "regardless of the fairness of the procedures used to implement them." *Id.* at 1785 (citations omitted). Because Foucha was not convicted, he could not be punished. Therefore, the state had no punitive interest in detaining a sane but dangerous person who had not been found guilty. *Id.*

Justice O'Connor emphasized the limitations of *Foucha* in her concurring opinion:

> I write separately, however, to emphasize that the Court's opinion addresses only the specific statutory scheme before us, which broadly permits indefinite confinement of sane insanity acquittees

nite in duration and because the burden of proof for release, was on the acquittee. *Id.* at 1787. For these reasons, the Court held the scheme did not qualify as an limited exception to the Due Process Clause. *Id.*

We are not asked, in the instant case, to decide whether Wisconsin's procedure for release would satisfy *Salerno,* because the state expressly declined, in its brief, to argue that an insanity acquittee is similar, for the purposes of confinement, to a pretrial detainee.

831

in psychiatric facilities. This case does not require us to pass judgment on more narrowly drawn laws that provide for detention of insanity acquittees, or on statutes that provide for punishment of persons who commit crimes while mentally ill.

I do not understand the Court to hold that Louisiana may never confine dangerous insanity acquittees after they regain mental health.

*Foucha,* 112 S.Ct. at 1789.[22]

---

[22] We think Justice O'Connor left the door open to the possibility of continuing the commitment of a sane but dangerous acquittee to a facility, other than a prison or a hospital, when she wrote: "It might be permissible for Louisiana to confine an insanity acquittee who has regained sanity, if unlike the situation in this case, the nature and the duration of the detention were tailored to reflect pressing public safety concerns related to the acquittees continuing dangerousness." *Foucha,* 112 S.Ct. at 1289.

As one commentator noted, "O'Connor accepted the idea of confining an insanity acquittee based solely on dangerousness and merely took issue with the continued confinement taking place in a mental institution. O'Connor intimates that insanity acquittees could be held in a 'dangerous person' facility once they are no longer found to be mentally ill." Rebecca Frank Dallet, FOUCHA v. LOUISIANA: THE DANGER OF COMMITMENT BASED ON DANGEROUSNESS, 44 Case W. Res. L. Rev. 157, 181 (Fall, 1993).

In his dissenting opinion in *Foucha,* Justice Thomas wrote:

> I have no idea what facilities the Court . . . believe[s] the Due Process Clause mandates for the confinement of sane-but-dangerous insanity acquittees. Presumably prisons will not do . . . . May a state designate a wing of a mental institution or prison for sane insanity acquittees? May a state mix them with other detainees? Neither the Constitution nor our society's traditions provides any answer to these questions.

*Foucha,* at 1809 n.18.

We read *Foucha* to permit the continued confinement of insanity acquittees based on dangerousness alone under a statutory scheme, such as Wisconsin's, where the nature of the commitment bears some reasonable relation to the purposes for which the individual is committed.

We recognize that the legitimate purposes of commitment following an acquittal by reason of insanity in Wisconsin are two-fold: to treat the individual's mental illness and to protect the individual and society from the acquittee's potential dangerousness. Unlike Louisiana's scheme, a successful insanity acquittee here has been adjudged guilty beyond a reasonable doubt—whether by trial or stipulation—of engaging in criminal conduct, before he or she is entitled to a hearing on insanity. Commitment following an insanity acquittal is, in part, premised on the defendant's criminal conduct. A successful acquittee, although relieved of the criminal sanctions for his or her criminal conduct, is nonetheless guilty.

It is the determination of guilt which provides the basis for the state to incapacitate and treat the insanity acquittee. Section 971.17(1), Stats., provides in part that "the court shall order [the defendant] to be committed to the department to be placed in an appropriate institution for custody, care and treatment until discharged as provided in this section."

Incapacitation for the purposes of treatment and rehabilitation, limited to the maximum term which could have been imposed for the criminal conduct, does not turn commitment into an impermissible form of

incarceration so long as the state houses the acquittee in a facility appropriate to his or her condition and provides the acquittee with care and treatment to overcome that which makes him or her dangerous. *Foucha,* 112 S.Ct. at 1789–90.

Wisconsin has two designated mental health institutions: Mendota and Winnebago. Section 51.37(3). Each facility is structured to provide housing appropriate to the needs of the individual acquittee. Each has designated levels of confinement (maximum, medium and minimum at Mendota; medium and minimum at Winnebago) providing appropriate treatment specializations to all patients. Treatment, broadly defined in sec. 51.01(17), Stats., as "those psychological, educational, social, chemical, medical or somatic techniques designed to bring about rehabilitation of a mentally ill, alcoholic, drug dependent or developmentally disabled person," is both therapeutically and behaviorally oriented.

We are aware that Wisconsin's mental health facilities offer comprehensive treatment programs designed to reduce the patient's propensity for dangerousness. Treatment programs available to acquittees such as Randall, include, but are not limited to, the following: reducing physical aggression, decreasing impulsivity and explosive outbursts, basic social skills training, improving emotional expression, taking responsibility for one's actions, inhibiting "acting out," teaching forethought about consequences, decreasing hostile verbalization and intimidating or provocative behaviors, and improving responses to authority.[23]

[23] The treatment programs we refer to are available to patients, including Randall, who are confined to medium or minimum security units at Winnebago. *See Mendota Mental Health Institute, Memo to Forensic Coordinators and M.D.'s,*

 Moreover, acquittees are "patients" for the purposes of Wisconsin's Patient's Rights statute, sec. 51.61(1), Stats. As such, they a have a right to receive prompt and adequate "treatment," rehabilitation and educational services appropriate to their condition. Section 51.61(1)(f). And although insanity acquittee's do not have the right to confinement in the least restrictive conditions necessary to achieve the purposes of their commitment, a right extended to other involuntary committees, sec. 51.61(1)(e), they are regularly transferred between levels of security, in both directions, from more to less restrictive and from less to

*November 30, 1993, from Dennis M. Doren, Ph.D., Forensic Clinical Director.* The record indicates that Randall was initially confined to a medium security unit but that he is now housed in one of the least restrictive units at Mendota. *See Partial Transcript, Trial on Petition for Re-examination,* May 22 through May 25, 1990, Opening Statement at 105, Closing Argument at 150.

One commentator points out that the Council of Psychiatry "recommended that the continued hospitalization of non-mentally ill personality-disordered acquittees is justified on the grounds that 'those who suffer from personality disorders may also benefit from the special management available only in a psychiatric institution where sensitive, comprehensive, unique and imaginative treatment programs can often be developed to assist them in overcoming their destructive behavior.'" *See Council of Psychiatry and Law, American Psychiatric Association, Final Report of the Sub-Committee to Review the Insanity Defense* 3 (1988) (*cited in* Abraham L. Halpern, THE INSANITY VERDICT, THE PSYCHOPATH, AND POST-ACQUITTAL CONFINEMENT, 24 Pac. L. Rev. 1125 April 1993)).

more restrictive environments.[24] As a matter of course, before an acquittee is transferred to a more restrictive environment, he or she is first afforded a due process hearing.[25]

In addition to treatment programs designed by the state, the acquittee may be transferred, with court approval and approval from the county department, to the care and custody of a county community program under sec. 51.42 or 51.437, Stats. Section 51.37(4), Stats. According to sec. 51.42(3)(aw)1, "a county department of community programs may provide for

[24] The record in the instant case indicates that Randall is presently housed in Gemini, one of the least restrictive units at Winnebago.

Winnebago Mental Health Institute **ASSESSMENT AND IMPROVEMENT OUTLINE FOR GEMINI PROGRAM,** describes the program as follows:

Gemini is a 20-bed, 90-day to six-month inpatient treatment program housed on a locked unit at WMHI [Winnebago Mental Health Institute]. Gemini accepts patients from all counties throughout the state of Wisconsin. The Gemini population is coed ranging in age from 18–50.

Predominant diagnostic groups among the patient population are schizophrenia, affective disorder, disorders of impulse control, substance-abuse disorders, organic brain syndrome, and psychotic disorders not otherwise specified.

Gemini patients also show impairment in social and occupational functioning and have failed to respond to community-based treatment.

[25] Section 51.61(5), Stats., requires the Department of Health and Social Services to establish procedures to ensure the protection of patient/resident rights guaranteed under Chapter 51 and to implement a grievance procedure to assure that the rights of patient/residents are protected and enforced by the Department. Accordingly, such a procedure was implemented by the Department in 1976, revised in 1978 and replaced on March 1, 1988 by Internal Operations Memo 10.06.

the program needs of persons suffering from mental disabilities, including but not limited to mental illness, developmental disability, alcoholism or drug abuse, by offering the following services:

 a. Precare, aftercare and rehabilitation and habilitation services;[26]

 b. Professional consultation; and

 c. Public informational and educational services.

From the foregoing, we conclude that the legislature has determined that the treatment programs made available to insanity acquittees in Wisconsin—regardless of whether administered by the state or the county—are not limited to the medical or pharmacological needs of the patient. This state's statutory scheme provides a structured environment which seeks to treat both the acquittee's mental and behavioral disorders.

To the extent that insanity acquittee's continue to receive treatment during their confinement at Mendota or Winnebago—whether that treatment is geared to reducing clinical symptoms of mental illness or behavioral disabilities which render the acquittee dangerous—we find there is sufficient medical justification to continue the confinement and treatment. Accordingly, we hold that sec. 971.17(2), Stats., (1987–88) does not violate due process because we conclude there is a reasonable relationship between the nature of the

---

[26] Habilitative services are those "which assist an impaired person's ability to live in the community." *In Matter of Athans,* 107 Wis. 2d 331, 336, 320 N.W.2d 30 (Ct. App. 1982).

commitment and the purposes for which the individual is committed.

### III. Hearing for Reexamination

Court imposed restraints must be coupled with a corresponding opportunity for care and treatment. Therefore, the appropriateness of continuing the confinement of an insanity acquittee depends upon whether or not the state has a medical justification for the commitment. The only legitimate goal for confinement based on dangerousness is to reduce, to an acceptable level, the risk of danger which the individual poses. To the extent that this goal is realized by providing treatment to the acquittee, confinement at a state mental health facility following an insanity acquittal is medically justified and, as such, constitutionally permissible.

In making a determination on dangerousness, courts should take full advantage of expert testimony presented by the state and the defendant. Although past conduct may be a significant indicator of future behavior, evidence of dangerousness should not rely solely on the acquittee's past conduct. The factors the court may consider in a hearing for reexamination to determine dangerousness are set forth in sec. 971.17(4)(d), Stats., (1993–94) which provides in part:

> The court shall grant the petition unless it finds by clear and convincing evidence that the person would pose a significant risk of bodily harm to himself or herself or to others or of serious property damage if conditionally released. In making this determination, the court may consider, without lim-

itations because of enumeration the nature and circumstances of the crime, the person's mental history and present mental condition, where the person will live, how the person will support himself or herself, what arrangements are available to ensure that the person has access to and will take necessary medication, and what arrangements are possible for treatment beyond medication."

Section 971.17(4)(d) applies to persons adjudicated not guilty by reasons of mental disease or defect for offenses committed on or after January 1, 1991. On remand, although not bound to apply the statute, the court ought to be cognizant of the legislative approval given to the principles that appear in the statute.

The ultimate determination of dangerousness requires a careful balancing of society's interest in protection from harmful conduct against the acquittee's interest in personal liberty and autonomy. *Humphrey v. Cady,* 405 U.S. 504, 509 (1972). We think the circuit courts of this state are properly guided in balancing these competing interests by the statutory factors provided by the legislature, in sec. 971.17(4)(d), Stats.

## IV. Conclusion

We conclude with the observation that Justice O'Connor gave provisional approval to statutes such as Wisconsin's which "limit the maximum duration of criminal commitment to reflect the acquittee's specific crimes and hold acquittees in facilities appropriate to their mental condition." *Foucha,* 112 S.Ct. at 1790.

Although Justice O'Connor referred to the revised version of sec. 971.17(1), (3)(c), Stats., (Supp. 1991) those aspects of the law which she found essen-

tial—limiting the maximum duration of the criminal commitment and holding the acquittee in a facility appropriate to his or her mental condition—are also present in the statutory scheme applied to Randall.[27]

We conclude that *Jones* and *Foucha* are not inconsistent. An indefinite term of commitment, as was upheld in *Jones,* is permissible when a dual standard for release is present, e.g., that the acquittee must be

---

[27] Under the 1987–88 version of sec. 971.17(4), Stats., the duration of the commitment may be no longer than the maximum period for which a defendant could have been imprisoned if convicted of the offense charged. Under the 1991 version, the duration of the commitment may not exceed two-thirds of the maximum prison term that could have been imposed. Section 971.17(1), Stats., (1991–92).

The older and newer versions are identical with regard to placing the acquittee in a facility appropriate to his or her particular needs:

Section 971.17(1), Stats., (1987–88) provides in part:

When a defendant is found not guilty by reason of mental disease or defect, the court shall order him to be committed to the department to be placed in an appropriate institution for custody, care and treatment until discharged as provided in this section.

Section 971.17(3)(c), Stats., (1991–92) provides in part:

If the court order specifies institutional care, the department of health and social services shall place the person in an institution under s. 51.37 (3) that the department considers appropriate in light of the rehabilitative services required by the person and the protection of public safety.

Both versions condition release on dangerousness; the 1991 law, additionally forecloses release to persons who pose a significant risk of serious property damage. Section 971.17(3), (4)(d), Stats., (1991–92).

Under the revised version, the legislature has eliminated the right to a trial by jury at the hearing on recommitment. Section 971.17(4)(d), Stats., (1991–92).

released when he or she is either no longer mentally ill or no longer dangerous. A single standard for recommitment, based on dangerousness alone, is permissible when all of the following criteria are met: (1) the maximum duration of the commitment is limited to reflect the acquittee's specific crimes; (2) the burden of proof at the hearing for recommitment or release is borne by the state; and (3) the acquittee is confined in a facility appropriate to his or her mental condition.

We conclude that Wisconsin's statutory scheme satisfies these criteria and therefore, that it is constitutionally permissible.

*By the Court.*—The decision of the circuit court is affirmed and the cause is remanded.

SHIRLEY S. ABRAHAMSON, J. *(concurring)*. I agree with the majority that this case should be remanded to the circuit court.

The state asks the court to uphold the constitutionality of sec. 971.17, Stats., (1987–88). According to the state, under sec. 971.17 a defendant found not guilty by reason of mental illness, who later does not suffer from mental illness, may be confined in a mental institution upon the state's proof by clear and convincing evidence that the acquittee is dangerous; the confinement may continue for the maximum period to which the acquittee could have been sentenced under the criminal law. The defendant argues that confining an acquittee in a mental institution solely upon proof of dangerousness alone is unconstitutional.

The majority opinion accepts neither the state's nor the defendant's position about sec. 971.17. Instead the majority opinion concludes that either "mental illness or behavioral disabilities which render the

841

acquittee dangerous" must exist before confinement can be continued.[1] Majority op. at 837. The majority concludes that a mental illness or behavioral disability must exist to provide "medical justification" for continuing the confinement of a dangerous acquittee under sec. 971.17, majority op. at 837, and further that the circuit court must find that the committing facility can provide treatment appropriate to the acquittee's needs.[2] Majority op. at 837, 841.

Section 971.17, Stats., (1987–88), is silent about the relationship of mental illness, behavioral disability, medical justification, or treatment to the continued confinement of an acquittee based on dangerousness. The majority opinion appears to graft these requirements onto sec. 971.17, because it concludes that such an interpretation of the statute is needed to render it constitutional. The majority is appropriately heeding a teaching of *Foucha:* "Due process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed." *Foucha v. Louisiana,* 112 S. Ct. 1780, 1785 (1992).

I cannot join the majority opinion, however, because I conclude that the majority's interpretation of

[1] The phrases "behavioral disorder" and "behavioral disability" are not used in either the civil or criminal commitment statutes. The majority apparently considers that dangerousness is caused by an underlying behavioral disability or disorder, but the majority gives no basis for this reasoning.

[2] The majority further concludes that Wisconsin's mental health facilities are designed to treat "mental and behavioral disorders" that can render an acquittee dangerous. Majority op. at 833–834, 837. The majority cites no authority suggesting that a behavioral disorder is treatable or that the "treatments" listed by the majority do in fact address behavioral disorders. The parties did not brief these issues.

sec. 971.17 violates another teaching of *Foucha.* As the state's brief explains, *Foucha* rejected the notion that the state could confine an acquittee in a mental institution on the basis of a condition which is not a mental illness, would not have justified the insanity commitment and was not the basis of that commitment at trial. [3] Thus a "behavioral disorder" (an important concept in the majority opinion but undefined) that renders the acquittee dangerous may be analogous to the antisocial personality condition in *Foucha,* which did not rise to the level of a mental illness or defect on which an insanity commitment could be based.

I recognize that *Foucha* is a troublesome decision and the subject of conflicting interpretations by courts and commentators. The majority struggles to avoid the conclusion mandated by *Foucha,* that mental illness as well as dangerousness are necessary grounds to continue confinement. If I read the majority opinion correctly, the state can continue to confine an acquittee who is not mentally ill but is behaviorally disordered and dangerous if the state can treat the acquittee, but the state must release an acquittee who is not mentally

---

[3] The State's brief reads as follows:

The Court in *Foucha* also rejected the notion that the state could confine Foucha in a mental institution on the basis of a newly diagnosed condition (antisocial personality), which the state conceded is not a mental illness and which apparently could not have justified the insanity commitment and was not the basis of that commitment in the first place simply because the condition had been evidenced by conduct in the mental institution which demonstrated Foucha may be dangerous to himself or others. *Foucha,* 112 S. Ct. at 1784–85. The state in the instant case, of course, has never suggested such an argument.

State's brief at 22.

ill but is dangerous if no treatment is available at the institution.[4]

I am unable to determine from the majority opinion what the circuit court should do on remand. I conclude that on remand the circuit court should determine whether Randall is mentally ill or dangerous or both.

For the reasons set forth, I concur in the mandate.

[4] "To be constitutionally permissible, the continued confinement of a sane but dangerous insanity acquittee in a mental health facility, must have some therapeutic value." Majority op. at 817.