STATE of Wisconsin, Plaintiff-Respondent,

v.

Alan Adin RANDALL, Defendant-Appellant.

Court of Appeals

*Nos. 2009AP2779–CR, 2009AP2780–CR, 2009AP2781–CR.*
*Submitted on Briefs February 25, 2011.*
*—Decided June 21, 2011.*

2011 WI App 102

(Also reported in 802 N.W.2d 194.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Craig S. Powell* and *Brian Kinstler* of *Kohler & Hart, LLP*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general, and *Sally L. Wellman*, assistant attorney general.

Before Curley, P.J., Kessler and Brennan, JJ.

¶ 1. BRENNAN, J. Alan Adin Randall appeals the trial court's order denying his petition for conditional release under Wis. Stat. § 971.17(2) (1987–88).[1] More specifically, Randall challenges the trial court's conclusion that Randall "continues to present a danger to others." Because we conclude that the trial court's findings are supported by credible evidence in the record, we affirm.

### BACKGROUND

¶ 2. In 1976, Randall was charged with three counts of first-degree murder, seven counts of burglary and two counts of operating a motor vehicle without the

---

[1] Pursuant to Wis. Stat. § 971.17(8) (2005–06), "[t]he commitment, release and discharge of persons adjudicated not guilty by reason of mental disease or mental defect for offenses committed prior to January 1, 1991, shall be governed by [Wis. Stat. § 971.17 (1987–88)], as affected by 1989 Wisconsin Act 31." All other references to the Wisconsin Statutes are to the 1987–88 version unless otherwise noted.

owner's consent. The charges alleged that in the course of several incidents over the span of a few months in 1974 and 1975, Randall burglarized several businesses and a police station. During one of the burglaries, Randall, then sixteen years old, shot and brutally killed two police officers.

¶ 3. Randall pled not guilty and not guilty by reason of insanity ("NGI") to eight of the twelve originally charged counts. Because of his NGI plea, Randall's trial was bifurcated.[2] During the first phase, the jury found Randall guilty of two counts of first-degree murder, four counts of burglary and one count of operating a motor vehicle without the owner's consent. Randall was acquitted of the third first-degree murder charge, two counts of burglary and one count of operating a motor vehicle without the owner's consent.[3]

¶ 4. In lieu of the second phase, the parties stipulated, based on a diagnosis of paranoid schizophrenia, that Randall was not guilty by reason of mental disease or defect for the two murder counts, and one count each of burglary and operating a motor vehicle without the

---

[2] *See State ex rel. La Follette v. Raskin*, 34 Wis. 2d 607, 150 N.W.2d 318 (1967) (Wisconsin requires each element of a crime to be proven before evidence is taken on an NGI plea.).

[3] Our rendition of Randall's pleas, charges, and convictions comes from the Wisconsin Supreme Court's opinion in *State v. Randall*, 192 Wis. 2d 800, 809–10, 532 N.W.2d 94 (1995) ("*Randall I*"). As that court noted, "[t]he trial court record of the guilt phase of Randall's original trial and the insanity proceedings following the guilt phase have been lost." *Id.* at 810 n.5. Consequently, the court in *Randall I* based its recitation of the facts on the parties' stipulation. However, in doing so, it appears that one of the original seven burglary counts remains unaccounted for, to wit, how that count was resolved is unknown. That fact is irrelevant to our resolution of Randall's claims on appeal.

owner's consent. Randall was committed to Central State Hospital on those four charges. He was sentenced to time-served in jail and probation with a stayed sentence for the remaining burglary convictions.

¶ 5. Randall first petitioned for re-examination and conditional release under Wis. Stat. § 971.17(2) on January 11, 1990. After a jury trial in May 1990, Randall was recommitted.

¶ 6. On June 7, 1991, Randall filed a second petition for re-examination and conditional release and a little later, a motion for immediate release challenging the constitutionality of his continued commitment. The Wisconsin Supreme Court in *State v. Randall*, 192 Wis. 2d 800, 808, 532 N.W.2d 94 (1995), (*"Randall I"*), affirmed the trial court's order denying his petition and found the Wisconsin commitment statute, Wis. Stat. § 971.17(2), constitutional. *Randall I*, 192 Wis. 2d at 837–38.

¶ 7. Randall petitioned a third time for re-examination and conditional release in November 1995, and a jury found that he continued to present a danger to himself or others. *See State v. Randall*, 222 Wis. 2d 53, 58–59, 586 N.W.2d 318 (Ct. App. 1998) (*"Randall II"*). He appealed on the grounds that the evidence failed to support the jury's finding of continued dangerousness because the doctors had testified that he was not currently mentally ill and that he could be released on specified conditions. *Id.* at 62–63. This court disagreed, and held that there was credible evidence in the record sufficient to support the jury's verdict of dangerousness. *Id.*

¶ 8. Randall filed the current petition for re-examination and conditional release, which the State opposed, on August 1, 2008. In his motion, Randall argued, just as he had in *Randall II*, that: (1) the

experts agreed he was not currently mentally ill and could be conditionally released; and (2) his behavior at Winnebago Mental Health Institute ("Winnebago") and Mendota Mental Health Institute ("Mendota") supported his release because he had been given so many liberties that he had essentially been on conditional discharge without a significant rule violation.

¶ 9. The trial court denied the petition for conditional release, concluding that the State had met its burden of proving that Randall was still a danger to himself or others under Wis. Stat. § 971.17(2). The court based its decision on: (1) the violent nature of Randall's crimes; (2) Randall's rule violations and other behavior problems at both Winnebago and Mendota; and (3) the experts' opinions and testimony. Randall appeals.

## Discussion

¶ 10. On appeal, Randall argues that: (1) the trial court's dangerousness determination rests upon clearly erroneous findings of fact; (2) the trial court abused its discretion by disregarding the experts' opinions; and (3) the record overwhelmingly demonstrates that Randall does not present a danger to others. However, after reviewing the record and the trial court's decision, we disagree, concluding that the trial court's decision was supported by credible evidence in the record and reasonable inferences therefrom.

¶ 11. The parties dispute the proper standard of review of the trial court's dangerousness finding under Wis. Stat. § 971.17(2). Citing to *State v. Jefferson*, 163 Wis. 2d 332, 338, 471 N.W.2d 274 (Ct. App. 1991), Randall argues that we should review the trial court's findings of fact under the clearly erroneous standard,

but that we should review the trial court's legal conclusion of dangerousness independently, giving the trial court's decision no deference.

¶ 12. The State argues that the proper standard of review for a WIS. STAT. § 971.17(2) finding of dangerousness is the sufficiency of the evidence test, as set forth in *Randall II*:

> We review the evidence supporting a . . . verdict finding dangerousness in the light most favorable to the verdict, and we will affirm, if there is any credible evidence, or reasonable inference therefrom, upon which the [factfinder] could have based its decision.

*Id.*, 222 Wis. 2d at 60. Thus, the State argues, the reviewing court examines the record for any "credible evidence, or reasonable inference therefrom" that supports the trial court's finding of dangerousness.[4] *See id.* The State distinguishes *Jefferson* on the grounds that it predated *Randall II* by seven years and involved a review of a revocation of conditional release, *see Jefferson*, 163 Wis. 2d at 335–37, whereas both *Randall II* and this case involve the trial court's denial of conditional release in the first instance.

¶ 13. We agree with the State and conclude that the proper standard of review is the sufficiency of the evidence test. *See id.*, 222 Wis. 2d at 60. We rely further on the sufficiency of the evidence test as it was explained by this court in *State v. Wilinski*, 2008 WI App

---

[4] Here, unlike in *State v. Randall*, 222 Wis. 2d 53, 586 N.W.2d 318 (Ct. App. 1998) (*"Randall II"*), there was a trial to the court as opposed to a jury. *See id.* at 58–59. However, the standard of review of the sufficiency of the evidence is the same whether the trial is to the court or to a jury. *See State v. Curiel*, 227 Wis. 2d 389, 418, 597 N.W.2d 697 (1999).

170, 314 Wis. 2d 643, 762 N.W.2d 399. *Wilinski*, decided after *Randall II*, held that the proper standard of review for an original Wis. Stat. § 971.17(3)(a) commitment is the sufficiency of the evidence standard, described as follows:

> The sufficiency of the evidence test asks whether a [trial] court could reasonably be convinced by evidence it has a right to believe and accept as true. [*State v. Brown*, 2005 WI 29, ¶ 40, 279 Wis. 2d 102], 693 N.W.2d 715. If the evidence supports multiple reasonable inferences, we will adopt the inference the [trial] court adopts. *Id.* When applying this standard, reviewing courts give "deference to the [trial] court's strength in determining the credibility of witnesses and in evaluating the evidence." *Id.*, ¶ 44. We "draw not only on a [trial] court's observational advantage, but also on the [trial] court's reasoning." *Id.*

*Wilinski*, 314 Wis. 2d 643, ¶ 12.

■

¶ 14. Thus, in a sufficiency of the evidence review under *Randall II* and *Wilinski*, we give deference to the trial court's determination of credibility and evaluation of the evidence and draw on its reasoning and adopt the trial court's reasonable inferences. If there are multiple reasonable inferences, we will adopt the inference that the trial court adopts. *See Randall II*, 222 Wis. 2d at 60 ("we will affirm, if there is any credible evidence, or reasonable inference therefrom, upon which the [factfinder] could have based its decision"); *see also Bautista v. State*, 53 Wis. 2d 218, 223, 191 N.W.2d 725 (1971) ("[I]f more than one reasonable inference can be drawn from the evidence, the inference which supports the finding is the one that must be adopted.").

¶ 15. On a petition for conditional release, it is the State's "burden to prove by clear and convincing evidence that the commitment should continue because the individual is presently a danger to himself, herself or others." *Randall I*, 192 Wis. 2d at 808. The Wisconsin Supreme Court in *Randall I* directed trial courts to determine dangerousness by considering the statutory factors of WIS. STAT. § 971.17(4)(d) (2009–10), and balancing the interests at stake:

> The ultimate determination of dangerousness requires a careful balancing of society's interest in protection from harmful conduct against the acquittee's interest in personal liberty and autonomy. *Humphrey v. Cady*, 405 U.S. 504, 509 . . . (1972). We think the [trial] courts of this state are properly guided in balancing these competing interests by the statutory factors provided by the legislature, in sec. 971.17(4)(d), Stats.

*Randall I*, 192 Wis. 2d at 839.

¶ 16. The non-exhaustive list of factors in WIS. STAT. § 971.17(4)(d) (2009–10) that the court *may,* but is not required to, consider in determining dangerousness includes: (1) " 'the nature and circumstances of the crime' "; (2) " 'the person's mental history and present mental condition' "; (3) " 'where the person will live, how the person will support himself or herself' "; (4) " 'what arrangements are available to ensure that the person has access to and will take necessary medication' "; and (5) " 'what arrangements are possible for treatment beyond medication.' " *Randall I*, 192 Wis. 2d at 838–39 (citing WIS. STAT. § 971.17(4)(d) (1993–94)).[5]

---

[5] The WIS. STAT. § 971.17(4)(d) (2009–10) statutory factors apply to adjudications of not guilty by reason of mental disease

¶ 17. Here, we review the record to see if credible evidence exists to support the trial court's finding of continued dangerousness. If so, we affirm, despite the fact that there may be evidence and inferences to the contrary. *See Randall II*, 222 Wis. 2d at 60.

■

¶ 18. Having set forth our standard of review, we turn to the trial court's conclusion that Randall cannot safely be discharged without presenting a danger to others. Based upon our review of the record, we conclude that the following evidence and reasonable inferences therefrom support the trial court's decision: (1) the brutal nature of Randall's crimes; (2) Randall's behavior while institutionalized, and (3) the mental health experts' testimony. We address each piece of evidence in turn.

1. *The Brutal Nature of Randall's Underlying Crimes*

¶ 19. Both the Wisconsin Supreme Court and the United States Supreme Court have held that " '[t]he fact that a person has been found, beyond a reasonable doubt, to have committed a criminal act certainly indicates dangerousness.' " *Randall I*, 192 Wis. 2d at 820 (quoting *Jones v. United States*, 463 U.S. 354, 364 (1983) (brackets in *Randall I*). Here, a jury found Randall guilty of multiple burglaries and the vicious murder of two police officers. Randall admits to the underlying facts of those crimes and "concedes that his actions in 1974 and 1975 evince a high level of dangerousness." *Randall II*, 222 Wis. 2d at 63. The trial court

or defect on or after January 1, 1991. WIS. STAT. § 971.17(8). Although Randall was adjudicated long before that date, the court in *Randall I* noted that the trial court on remand was not bound to apply the statute but directed it to be cognizant of the factors. *Id.*, 192 Wis. 2d at 839.

relied, in part, on the brutal nature of Randall's original crimes when concluding that Randall still poses a danger to society.

¶ 20. The facts found by the trial court and admitted by Randall are briefly as follows. Police officers testified that Randall, age sixteen, committed several burglaries, stealing weapons and other items which he hid in a pit he dug in the backyard of his family's home. During his third burglary of the Town of Summit Police Station, he was surprised by two police officers returning to the station in a squad car. Randall shot one of the police officers six times in the chest, legs, back, shoulder, arm and temple. Some of the shots were at- or near-contact range. He shot the other police officer in the face and neck. Both police officers died of massive hemorrhaging. Randall dragged their bodies to hide them in bushes and down an embankment. He then stole their bloodied squad car and used it in another burglary where he stole more firearms. Finally, after returning the squad car to the municipal building, he went home to bed.

¶ 21. The trial court reasonably inferred from these undisputed facts that "[c]learly, anybody that got in [Randall's] way of doing this he was, essentially, killing them so they could not stop or halt him from his conduct." Such brutal criminal acts, for which Randall was found guilty, are evidence of dangerousness.

2. *Randall's Behavior at Winnebago and Mendota*

¶ 22. The trial court's dangerousness decision was also based on evidence in the record that while institutionalized at Winnebago and Mendota, Randall was secretive and lied to staff, breaking rules when it suited him. Randall's behavior at the institutions demonstrated his continued dangerousness because much of

that behavior mirrored behavior Randall engaged in during his crime spree in 1974 and 1975.

¶ 23. The trial court incorporated into its opinion some of this court's findings in *Randall II*, including:

- Randall's secretive behavior at Winnebago in 1994, to wit, hiding items above the ceiling tiles in Winnebago's bicycle shop and then denying that the items were his. The court found that his behavior was similar to behavior he exhibited during his original crime spree, namely, when he hid a CPR dummy above the ceiling tiles of a high school during a burglary.

- Randall became increasingly angry when confronted about his lying.

*See id.*, 222 Wis. 2d at 58–59.

¶ 24. The trial court also made specific findings of rule violations and inappropriate behavior based on the testimony about Randall's stay at Winnebago and Mendota since 1996:

- Randall failed to report to his supervisors that he had inherited a very large sum of money and a trailer.

- Randall purchased real estate with a structure on it for $42,000 with his inheritance without revealing that fact to his supervisors or obtaining permission.

- Randall hid illicit items in the property he purchased.

- Randall received mail at the property without the approval of his supervisors.

- Randall maintained a bank account without disclosing it to staff.

- Randall only revealed the existence of his ownership in the property fourteen months after the purchase when he wanted his supervisor's help because he believed the real estate broker had cheated him out of $70,000.

- Randall lied when he was told to turn over all of the keys to his property, saying he had done so, but actually retaining the keys.

- Randall lied when he told his supervisors that he had discontinued receiving mail at the property as they had required, when in fact he continued to receive mail at the property.

- Randall violated the conditions of his off-ground work privileges by going to his property and a restaurant without permission.

- Randall was aware of the institution rules.

From these findings of fact the trial court observed that Randall was "being devious, being secretive, being, essentially, deciding he's going to do things as he wishes to, regardless of what may be the issue or the restrictions or the limitations."

¶ 25. Randall does not dispute that while at Winnebago he violated the rules when he failed to report his inheritance, house purchase, hidden illicit items, bank account, receipt of mail at the property, retention of the keys, and unauthorized activities with unauthorized persons at unauthorized places. He does not dispute that while at Mendota he engaged in inappropriate, secretive conduct, including purchasing buckshot and a rope and bringing them into his living unit, and recording a conversation with a staff member on his laptop computer without that person's permission.

¶ 26. Instead, Randall argues that none of these rule violations are significant because they did not

involve violence and because he was punished for the rule violations with a very minor sanction—revocation of his employment pass for ten days—which indicates that the institution did not consider his violations significant. Randall also argues that his extensive privileges at Winnebago, including off-grounds passes for work, school and recreation, and his transfer to Mendota, which he describes as a pre-release placement facility, are evidence of his positive adjustment. However, we will affirm the trial court's findings if supported by credible evidence, even if there is other evidence in the record that would support a contrary finding. *See Wilinski*, 314 Wis. 2d 643, ¶ 12. That is the case here.

¶ 27. In addition to the evidence of Randall's rule violations and inappropriate behavior, there was testimony from staff of aspects of his personality that the trial court relied on for its finding of dangerousness. For example, Dr. John Kennedy's report quoted the social worker from Winnebago saying that Randall had an angry streak, refused to take responsibility for his criminal behavior, and continued to lie and to deceive them even after he was given tighter restrictions. The social worker believed Randall was anti-social and able to manipulate.

¶ 28. The trial court compared the testimony of Randall's secretiveness and coldness at Winnebago to the testimony that as a teen Randall was cold, detached, aloof and a loner. Randall was described by one expert as a "perfect Mafia man" in that he is "so cold and stone-faced that nobody can know what he is doing." The trial court found that these traits and similarities with his behavior in 1974 and 1975 heightened the court's concern that Randall was still dangerous.

¶ 29. Simply stated, the record here shows ample support for the trial court's findings. Randall's devious, secretive and intentional rule-breaking behavior, similar to his behavior at the time of his crimes, demonstrates that he continues to be dangerous.

### 3. *Randall's Past and Present Mental Condition*

■

¶ 30. The trial court also found continued dangerousness based in part on the mental health experts' testimony. The trial court properly considered the experts' testimony and acknowledged that all three psychologists testified that Randall was not currently mentally ill and that he presented a low risk of dangerousness.[6] However, the trial court correctly noted that it was not required to accept the experts' assessments of dangerousness, *see Randall II*, 222 Wis. 2d at 63, and reached a different conclusion on his dangerousness.

¶ 31. In evaluating the expert testimony, the trial court found that the experts concluded that Randall had been misdiagnosed and was not schizophrenic at the time of his original crimes. Based on that testimony, the trial court found that it was left without any explanation for Randall's original violent behavior: "[T]hat then calls into question what was the reason or what could be the justification for the incidents that occurred." Because the cause of Randall's original crimes was unexplained

───────────────

[6] In *Randall I*, the Wisconsin Supreme Court held that Wis. Stat. § 971.17(2) is not unconstitutional under the Due Process Clause for permitting a State to confine an individual found not guilty by reason of mental defect who is no longer mentally ill, solely on the grounds that the individual is a danger to others. *Randall I*, 192 Wis. 2d at 806–07. Consequently, a trial court need not determine that a defendant is currently mentally ill before it can deny a petition for release. *See id.*; § 971.17(2).

and because Randall continued his secretive, rule-breaking behavior, so similar to his behavior at the time of his original crimes, the trial court found that Randall continued to be dangerous, saying:

> As I said, as we sit here in 2009, nothing has changed in terms of the potential dangerousness that Mr. Randall represents to the community. He's had no treatment. He's not on any medication. There's been no diagnosis of any crime, nor has there been any rational indication of why he committed the offenses that he did. All of that indicates that nothing has changed other than the passage of time.

¶ 32. Randall disputes the trial court's findings that: (1) his crimes were not attributable to mental illness; (2) he received no treatment; and (3) nothing has changed but the passage of time. He argues that the parties stipulated that he was mentally ill at the second phase of his NGI trial, that he did receive some treatment, although he admits never in the form of any medication, and that he has changed over time.

¶ 33. We conclude that credible evidence and reasonable inferences from the mental health witnesses' testimony, supports the trial court's findings that Randall was not mentally ill at the time of his crimes, was never treated for mental illness with any medication and continues to engage in the same type of behavior that he exhibited at the time of his original crimes.

¶ 34. The evidence at trial included the testimony of two doctors who have repeatedly evaluated Randall over the years, Dr. Frederick Fosdal and Dr. Ralph Baker, who both testified and agreed that the original paranoid schizophrenic diagnosis was incorrect. Dr. Fosdal went so far as to testify that in his opinion Randall did not have any mental illness at the time of

the original crimes. This testimony, alone, supports the trial court's finding on misdiagnosis.

¶ 35. Dr. Fosdal, a witness for the State, testified that he was the expert on competence at Randall's original trial and testified that in his professional opinion, Randall was not suffering from a mental disease. He testified that he never saw any indication that Randall was out of touch with reality or psychotic. Dr. Fosdal testified later that Randall did suffer from schizoid and paranoid personality traits, but he explained that he did not believe a personality disorder is a mental disease and he believes most experts agree. Further, Dr. Fosdal testified that schizophrenia is a mental illness that cannot go into remission unless treated with medication, and it is undisputed that Randall was never treated for schizophrenia with medication. Thus, Dr. Fosdal's testimony alone is sufficient to support the trial court's finding that Randall was not suffering from any mental illness at the time of his original crimes.

¶ 36. Dr. Baker, the court-appointed expert who had examined Randall a total of six times since 1990, agreed that Randall was not currently mentally ill. Based on that undisputed fact and the undisputed fact that Randall had never been treated with medication for schizophrenia, Dr. Baker testified that Randall's original diagnosis of schizophrenia was incorrect.

¶ 37. Randall correctly points out that Dr. Baker testified that it was probable, and later said that he was "convinced," that Randall was suffering from *some* mental illness at the time of his offenses, but Dr. Baker also testified that he was certain that Randall did not suffer from schizophrenia. Given that Dr. Baker never examined Randall at the time of the original trial and had only read the other experts' reports, he could not

415

offer a diagnosis of Randall's mental condition at the time of his original crimes. Thus, his testimony fails to support a finding that Randall suffered from some other type of mental illness. Accordingly, both Drs. Fosdal's and Baker's testimonies support the trial court's finding that there is no evidence of schizophrenia or any other mental illness in 1974 and 1975.

¶ 38. Even Dr. John Kennedy, the defense's expert, testified that a person with schizophrenia does not go into remission without medication, which Randall admits never receiving. As Dr. Kennedy agreed that Randall was not currently suffering from schizophrenia, his testimony allows a reasonable inference that Randall did not originally suffer from paranoid schizophrenia.

¶ 39. In terms of Randall's present mental condition and whether it warrants conditional release, the experts testified about the actuarial instruments that they tested Randall with to determine dangerousness and their conclusions. Dr. Fosdal and Dr. Kennedy testified that Randall presented a low risk of dangerousness and Dr. Baker testified that Randall is ready to be released and does not pose a significant risk of dangerousness.

¶ 40. However, as we noted in *Randall II*, the trial court is not obligated to reach the same conclusion that the experts reached, even if those opinions were uncontroverted. *See id.*, 222 Wis. 2d at 63. Indeed, in *Randall II* we affirmed the trial court's finding of dangerousness despite the fact that there, just as here, the experts testified that Randall could be safely conditionally released. *See id.* at 58, 67. We found credible evidence in the record from which the jury could have reasonably concluded, contrary to the experts' opinions, that Randall was still dangerous:

the jury could have concluded that Randall had been misdiagnosed as a paranoid schizophrenic at the time of the initial trial, in which case his dangerousness is independent of that mental illness diagnosis, and therefore, his lack of current symptoms of that mental illness was of marginal relevance to the issue of whether he might become violent again.

*Id.* at 63. Similarly here, the trial court properly rejected the experts' opinions on dangerousness after conducting its own balancing test based on all of the evidence.

¶ 41.　In sum, the absence of any mental-illness explanation for Randall's brutal and violent crimes and his secretive rule-breaking behavior that was so similar to his behavior at the time of the original crimes, reasonably led the trial court to find that Randall remained dangerous.[7]

## CONCLUSION

¶ 42.　The trial court reasoned that in the absence of any mental illness at the time of Randall's original crimes there was no explanation or justification for the brutal events of 1974 and 1975. This very reasoning was suggested and approved by the court in *Randall II*. *See id.* The trial court found that Randall's behavior while at Winnebago and Mendota over the years showed that he was "being devious, being secretive, being, essentially, deciding he's going to do things as he wishes to, regardless of what may be the issue or the restrictions or the limitations." Responding to the

---

[7] To the extent that we or the trial court did not consider all of the factors set forth in WIS. STAT. § 971.17(4)(d) (2009–10), we reiterate that § 971.17(4)(d) only sets forth factors the court *may* consider. Furthermore, not all of the factors are relevant to the facts of this particular case.

Winnebago staff person's comparison of Randall to a member of the Mafia, the trial court found that "calmness and the ability to make those decisions, and to carry out those acts clearly expresses what was the very real dangerousness as relates to Mr. Randall."

¶ 43. These findings and inferences are reasonable and based on the record. The trial court's conclusion that Randall is dangerous is supported by credible evidence and reasonable inferences and accordingly, we affirm.

*By the Court.*—Order affirmed.